On March 23, 2007, the defendant officers pulled over the Tarabochias in an administrative stop, a roving vehicle stop, one in which they had no reasonable suspicion that the Tarabochias had committed any wrongdoing whatsoever. Within three years of that stop, that is, within the limitations period for bringing a Section 1983 suit, the Tarabochias filed suit for violation of both their Fourth and Fourteenth Amendment rights. Neither of those two facts is in dispute. What is in dispute? Well, I think that the State disputes whether or not there was reasonable suspicion to stop the clients. Respectfully, Judge Rawlinson, the State doesn't dispute that there was no reasonable suspicion of wrongdoing. The State's claim for stopping the Tarabochias is that they witnessed them engaging in regulatory activity, not regulatory activity in any unlawful way. So in other words, the State's position is we saw the Tarabochias engaged in activity the State regulates, and that gives us the right alone to pull them over. So let me ask you, would you agree that your clients are commercial fishermen? Yes, Your Honor. And would you dispute the fact that the State has the right to inspect the catches from commercial fishermen? In certain circumstances, Judge Rawlinson, I would say for the sake of this argument, we are not contesting that commercial fishing is a regulated industry. The parties agree on that much. However, in order to invoke the closely regulated exception, which is what both parties have called the exception that the State seeks to invoke here in the Fourth Amendment's requirements, at least three things need to be present, and none of them were present here. The first one is that the State, the officers, had to be specifically authorized to conduct their stop by valid State statutes. And there were none here. Now, the State has proffered two possible statutes as their predicates for stopping the Tarabochias. The first one is Section 771580 of the Washington Code. But as the State courts in this case ruled below, that statute does not empower the search of commercial fishermen. There's a separate statute that dictates the search of commercial fishermen. The second reason why Subsection 80 doesn't apply here, Judge Rawlinson, is that it only applies to searching individuals while they are engaged in the act of fishing. And as the State's own case, Schlegel indicates, under Washington State law, engaged in means still either going to the site of fishing or still actively engaged in fishing. It does not cover searches where a person is leaving the scene of the fishing. The second statute that the State. So just so I understand your argument, you're saying that once the fisherman completes the catch, then the wardens or the officials have no power at that point to search for the catch? Judge Rawlinson, I think that there's, that's not completely true. They could have set up a checkpoint. And a checkpoint has a completely different level of constitutional scrutiny than the roving vehicle stop they engage in here. But absent a checkpoint, is it your position that once the catch is completed, then the wardens lose all ability to search the catch? Absent reasonable suspicion that there was any actual wrongdoing in the catch, we're not aware and the State has not pointed us to any statutes which specifically authorize them to conduct a roving vehicle stop of a vehicle which is going away from the site of the catch with fish in it. These parties have a bit of a history, don't they? Absolutely, Judge Hawkins. And that plays a big role in this case, I believe. And isn't it the State's position that they didn't search at the dock, if you will, but waited until they were on the roadway because in part of the prior history? It's an interesting submission, Your Honor, and I think the State has mentioned that in the past. However, on summary judgment, all the factual inferences are supposed to be interpreted in favor of the Tarabachias. That's one thing. The second thing is it's a little bit hard to take the State's concern about not creating an incident at complete face value when what this resulted in was a chase where they literally surrounded my client's vehicle with an army of officers and forced them to get out of their car. Well, there was some delay between those two events, wasn't there? Absolutely, Judge Hawkins, there was. About 20 minutes or so? I believe that the chase itself took, it might have been a little bit more than that. Wasn't it vehicles, the Tarabachia vehicle was pulled over. It was about a 20-minute pause, right? That's correct, Your Honor, yes. Because they wouldn't get out of the vehicle. That's right. Because of the history they had had with the officers in the past. That's right. Go ahead. Thank you. Thank you, Judge Hawkins. The second reason why the closely regulated exception doesn't apply here, Judge Rawlinson, is because even if there was a statute validly authorizing the action, there would have to be a detailed regulatory scheme explaining exactly under what circumstances the search and stop could take place. And the reason for this is because the closely regulated exception is not crafted by the Supreme Court to serve as a blank check to administrative officials. Instead, it is a carefully crafted substitute for the warrant requirement. So in the same way that a warrant is based on an executive determination of probable cause, followed up by a neutral mat-estate giving a judicial stamp of approval, here we have to have sufficient indicia that there is not going to be some kind of random blank check stop by the officials. And that, in the cases such as Colonna, Dewey, Biswell, and Rob, all of which are cited in our briefs, that takes place in the form of regulatory scheme. A scheme that tells the officers when they can search, where they can search, what containers they can search. There are detailed regulations that simply weren't present here, and the state has never pointed to any regulatory scheme to justify their actions. And then the third independent reason why the regulatory exception does not apply here is because we have not come across any case which has indicated the exception applies anywhere outside the field. And again, this makes sense. If you engage in a regulated industry, then you should expect inspectors under certain circumstances to come to your retail liquor store, to come to your firearms factory. What you don't expect, however, is that once you engage in a commercial activity, that the administrative officers can pull you over anywhere at any time as long as they watched you at some point previous, at some place previous engaging in that activity. And that's really one of the big problems here, that there's no logical stopping point to the state's argument. The state claims that as long as they saw the Tarabakis fishing, they can stop them. There's no reason why that would take place five minutes later, an hour later, multiple hours later, a thousand miles away. There's simply no basis for drawing a line where the state's power stops. Counsel, the district court granted summary judgment on the basis of the statute of limitations. What's your response to that? On the 14th Amendment claim, that is correct, Judge Rawlinson. And our response is that this district court did not include the March 23rd stop as a predicate for the 14th Amendment claim. So when the district court originally held, correctly in our view, that summary judgment was inappropriate on the merits, it looked at the history between the parties and said, all of this shows is evidence that the state engaged in shocks-the-conscious kind of behavior. There was an abuse of governmental authority. But what the district court has to say about that. But where there's a clear Fourth Amendment violation, isn't that what we should look at, not the 14th Amendment? Judge Bea, respectfully, we would ask you to look at both. We think that there was a clear Fourth Amendment violation, and there's actually no dispute that there was evidence that there was. How is your remedy any different under 14th and Fourth? Judge Bea, the remedy is not necessarily any different. So why is it accumulative? Why is the remedy not accumulative? Why is the 14th Amendment remedy accumulative? Well, Judge Bea, actually, there's a couple of reasons. The first one is that the Fourth Amendment claim is based only on the March 23rd stop. Right. So that's the only thing from which they can draw damages. The 14th Amendment is based on the March 21st, 2007, stop and a bunch of others which are outside the Fourth Amendment, the three-year statute. That is correct, Judge Bea. But the pre-2007 events are still drawn in by the continuing violations doctrine, a point that the State has never contested below. The State's only position is that the March 23rd stop shouldn't count as part of the 14th Amendment predicates. And while it's a little unclear why, and again, the district court didn't give any reason why it left out the March 23rd stop from the 14th Amendment predicates, but I believe it's because they're saying that a 14th Amendment, the stop can't simultaneously serve as both a Fourth Amendment claim and a 14th Amendment claim. But this Court has held to the contrary, most recently in the A.D. case that we cited in our briefs. And in that case, a plaintiff was allowed to sue on both Fourth and 14th Amendment claims, grounds, when the plaintiff's mother was shot by police officers. The plaintiff was able to say objectively the shooting was unreasonable, making an excessive force claim under the Fourth Amendment. Could you briefly address the qualified immunity issue? About whether it was reasonable, sorry, whether there was. Whether or not there was clearly established law that would inform the officers that the stop violated the Fourth Amendment. And I see my time is up, Judge Rawlinson. I hope to finish your question. Could you please, yes, please. Of course. So Prowse and Munoz clearly established the law that officers, administrative officers, cannot conduct administrative checks in roving vehicle stops without reasonable suspicion of wrongdoing. The State's position that the closely regulated exception applies has also been, the fact they cannot apply the exception is also clearly established by the many cases that we cited and the three independent reasons why the exception cannot be applied. All right. Thank you, Counsel. Thank you, Judge Rawlinson. We'll hear from the State. Good morning, Your Honors. Good morning. Please, the Court, Paul James representing the defendants, Chadwick Sensi, Brett Hopkins, and Mr. Roden. This is a case involving a stop of commercial fishermen known to be transporting freshly caught salmon to market who made the decision that they were not going to pull their vehicle over to submit to a compliance inspection by Washington Fish and Wildlife officers. The district court properly determined that there was no clearly established Fourth Amendment case law which would have prescribed and informed these defendants that they had the authority, that they did not have the authority to stop and inspect these fishermen's catch without a warrant or without reasonable suspicion of unlawful conduct. What was the factual basis for the stop? The factual basis for the stop, Your Honor, is that Officer Sensi's ride-along passenger had observed the Tarabokias. A newspaper reporter. Right. Bill Monroe had observed and informed Officer Sensi that he had observed the Tarabokias loading fish into the container in the back of their pickup. Was the newspaper reporter able to count the fish or measure them? No, no, that would not have been possible. The mere fact that there was fish taken out of the water and put in a container is evidence of a violation? No, it's not evidence of a violation, Your Honor. What proof did the newspaper reporter have? I take it the officer did not observe this. The officer observed activity that looked like the fishermen were engaged in. But he did not observe what you just described. Right. The basis for that is the newspaper report. Yes, and a reliable informant informed the officers that fish was in the Tarabokias' possession. That's correct. The reliable informant being the newspaper reporter? Yes. So this reporter had a history of working with fish and wildlife people? Well, there was certainly no reason to doubt that he was a credible witness, given the circumstances. There's a difference between no reason to doubt and a history of accurate information provided by such a person. Yes, there is, Your Honor. And I'm not suggesting that Mr. Monroe has a history of going with the- Now, what would have been the violation? We're talking- Not simply catching fish. No, no, no. Not putting fish in a container, correct? Am I right so far? Yes, you are. Okay. The offense would have been complete if they had taken those fish and sold them commercially? No, what we're talking about is a compliance inspection, Your Honor. We're talking about- Trying to find out what the violation was. There is no- A probable cause for a violation. There was no probable cause for a violation, okay? What we have here is we have commercial fishermen engaged in the pervasively regulated activity of commercial fishing. Once that occurs, the pervasively regulated exception springs into effect, meaning that the government's or the state's interest in protecting and preserving this fishery resource, the state's interest in complying with the mandate under the United States versus Washington, the Bolt decision to allocate fish properly between tribal and non-tribal fishermen, the state's interest in making sure that the provisions of the Endangered Species Act are complied with. There is no way that those federal mandates can be complied with. There is no way that the requirements that Judge Bolt set forth 40 years ago in U.S. v. Washington can be complied with unless fish and wildlife officers can count the fish, the pervasively regulated exception. The problem would have been the number of fish? Well, there's a whole bunch of potential problems, but we can't get to the potential problems. They actually did ultimately inspect the contents of the container which enclosed the fish, correct? Yes, correct. Would they find any evidence of a violation? No. Okay. So does the state's interest include the roving field stop that was used here? Well, you know, there are two types of, you know, if you want to call it roving field stops. One is a roving field stop where they have no idea that a person is engaged in a pervasively regulated activity, like fishing and hunting, and the other one is in which they do. All right. For the latter, is it your position that the stop is justified under the state statutes? Yes, absolutely. I mean, the state statute, you know, has a, I mean, I agree with counsel that fish and wildlife authorities shouldn't have unfettered discretion to check anybody anytime they want, but the state statutes in this case do have reasonable time, place, and manner restrictions requiring articulable facts that a person is engaged in fishing activities, and under no circumstances do the fish and wildlife officers have the authority to enter into a quarters in a boat, quarters in a building, or other property that is used as a residence. So there are reasonable time, place, and manner restrictions on their authority to inspect. So, yes, they are constitutional. Is the statute which says that state officers can perform vehicle searches on the road, stopping vehicles and searching them? Well, the statute gives... One of the requirements is that a specific statute explicitly authorizes the particular search. Well... I mean, I can understand a particular search, say, at a customs border. There's a statute saying everything can be searched. Is there a statute saying that Washington can stop commercial fishermen on the road? There is a statute which says wildlife officers can inspect without a warrant at reasonable times and in a reasonable manner. What's reasonable about inspecting this fisherman who was observed fishing? Well, what's reasonable about this is you look at the time, you look at the place, and you look at the manner. In this case, the time was moments after they had left the dock, known to be transporting fish to market, and they admit they were transporting fish to market. It's not unusual for a fisherman who's a commercial fisherman to be transporting fish to market. Is your position that any commercial fisherman can be pulled over by any agent at any time, day or night, as he's leaving his dock with fish in it, regardless whether any unlawful activity has been observed, regardless whether there's any reasonable suspicion, because he's a commercial fisherman? Because he's a commercial fisherman, because he engages in a pervasively regulated activity, because every commercial fisherman... You're begging the question. How pervasively regulated is it? There is no specific statute saying fishermen can be stopped on the road, right? Right. They can be stopped at reasonable times, unreasonable manners, and reasonable time, right? That's correct, Your Honor. And the facts and circumstances of this case show you that this was a reasonable time, place, and manner search. Why was it a reasonable time to search him? Because he had fish, and he's a commercial fisherman. And the Tarabokias admit that they can be inspected on their boat, on the dock, at the fish market, yet they claim some privacy corridor between the time when they leave the dock... other than were provided by statute on their boat and on their dock and in the market. So with those three places, they can be searched. And they're saying, you can't search me anyplace else. The cases that analyze the Fourth Amendment, Your Honor, do not make that specific distinction. But the cases that look at the Fourth Amendment, they analyze the important state interests, the fact that commercial fishermen like the Tarabokias don't have a reasonable expectation of privacy when they're engaging in that pervasively regulated activity. And the very fact is that the reasons for the regulation of the fish, the preservation of this fishery resources, and the assurance that it can be properly allocated between treaty and non-treaty fishermen can occur. Was there any observation that the fish involved were being taken from a treaty source? No, there was no observation of that. Is there anything about the nature of the fish? They were hatchery salmon. They weren't taken from a treaty source, right? Well, as Judge Bolt said 40 years ago, and this is the 40th anniversary of the decision... The question looked for a yes or no answer, not a soliloquy. What's the answer to the judge's question? The answer, were they illegal fish? Yes. No, they were not illegal fish. But to be able to ensure that the fishery resource is preserved for current and future generations, as Judge Bolt said in U.S. v. Washington, you have to have the ability to count the fish. The other factor is here, you know, the geographical... Was the amount of fish an excessive amount? No. But there was somebody watching them put the fish in the truck, right? Right. Did he count the fish and say, ah, it's an excessive amount? No, no, Your Honor. What we're talking about is a compliance inspection. Compliance with what? Compliance with a suspicion? Every time you have a person engaged in a pervasively regulated activity... Okay, I got your point. You look at the important state interest involved. You look at the special needs that the state has. You have to sign a specific statute explicitly authorizing the particular search. If you're looking for a specific statute that says the Fish and Wildlife Officers could pull them over on a road, it doesn't say that. Okay. What it says is that they can inspect at reasonable times and in a reasonable manner. The inspection here occurred minutes after the Tarabokias left the dock. If the Tarabokias had not made the decision to refuse to pull their vehicle over, the intrusion into their lives would have been no more than a few minutes. All right, counsel. Could you briefly discuss qualified immunity? Yes. In response to a motion for summary judgment on qualified immunity, it was the Tarabokias' burden of proof to come forward with clearly established law prescribing as unreasonable a stop of commercial fishermen transporting salmon to market and a corresponding limited search of their container. Munoz is not on point. The officers in that case had no knowledge that Mr. Munoz was transporting or Mr. Munoz had engaged in any regulated activity. And there is no clearly established law in this case that would say that the officers could not conduct a brief compliance inspection. The McHale case, the California Supreme Court decision that the district court partially relied on, although not binding precedent, addressed the fact that to date the United States Supreme Court has not directly addressed the question of the constitutional validity of a brief stop of a hunter or fisherman and the ability of a game warden to demand the display of the fish in English possession, whether the fisherman is on foot or in a vehicle. So there is no clearly established law which would have prescribed and told these defendants that a brief compliance inspection of the Tarabokias' fish on the date in question was unlawful. All right. Thank you, counsel. You're welcome. Counsel, we'll give you one minute for rebuttal. And while you're making your way up here, on behalf of the court, I would like to thank you for accepting this case pro bono. It was our pleasure. Thank you. Please proceed. Three points, if I have time to get to them, Judge Rallison. The first one is that opposing counsel at the very end spoke about how Munoz is distinguishable because in that case they did not see regulated activity. While that's in some question, I think the important thing here is that it would not distinguish prowse. In prowse, the police officer who pulled over the driver for a regulatory license check obviously saw the person driving, saw the person engaged in the regulated activity. That's one reason why that distinction doesn't work. The other reason why is because the only reason why it would be relevant that the officer saw a person engaged in regulated activity is if you were trying to invoke the closely regulated exception, which the State is trying to invoke here. And as we've discussed earlier, and as I think Judge Bea's incisive questioning illustrated, that exception is not available here. There was nothing giving notice to the Tarabachias or any other commercial fishermen that those statutes or any subsequent regulatory scheme would have told them that they would be subject to inspection at that point. And then I would ask for a few more seconds to make my final point, if that's all right, Judge Rallison. And I finally wanted to go back to something that Judge Bea asked earlier, which is why the 14th Amendment claim, if it's cumulative. As we explained before, we don't think it is. But it's important to note that 1983 claims, a lot of them are not about the money, although the money is nice. They're about vindication, vindication of one's constitutional rights. And people bring 1983 claims all the time. The last question was why can't your client's interest be completely vindicated through the Fourth Amendment? And the reason why, Judge Hawkins, is because not only are they interested in not being stopped like this in the future, but they also want the subjective harassment to come to an end. There needs to be a legal ruling that the persecution. What about the 14th Amendment would give greater protection for that as opposed to the Fourth Amendment? The 14th Amendment claim, the 14th Amendment victory would put the officers on notice that the subjective motivation behind the way they have dealt with the Tarabachias in the past is illegal and that they cannot continue to persecute the Tarabachias based on the history the parties have had. All right. Thank you. Thank you very much. Thank you to both counsel for a case well argued. The case just submitted is the case just argued is submitted for decision by the court.
judges: Hawkins, Rawlinson, Bea